**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ANTHONY J. KEY,                           *
                                          *
Plaintiff,                                *
                                          *
v.                                        *          Civil Action  MJM-21-2021
                                          *
MONTGOMERY COUNTY                         *
MARYLAND, *et al*.,                       *
                                          *
Defendants.                               *
                        * * * * * * * * * * *

## <u>MEMORANDUM OPINION</u>

Anthony J. Key ("Plaintiff") commenced this civil action against Montgomery County, Maryland, and Correctional Officers Pate and Butterworth (collectively "Defendants"), under 42 U.S.C. § 1983 and the Maryland Declaration of Rights.[1] Plaintiff alleges that he was injured during an altercation with Pate and Butterworth at the Montgomery County Correction Facility in Boyds, Maryland ("MCCF"), where Plaintiff was detained pending trial. The Complaint includes three counts:

> Count I, 42 U.S.C. § 1983 excessive force claim against Pate;
>
> Count II, 42 U.S.C. § 1983 excessive force claim against Butterworth; and
>
> Count III, Maryland Declaration of Rights excessive force claim against all Defendants.

Defendants move for summary judgment on all counts (ECF No. 32). The Court has reviewed Defendants' memorandum in support of the motion, Plaintiff's memorandum in opposition, Defendants' reply memorandum, and documents attached to the memoranda. A

---

[1] The parties have consented to proceed before a United States magistrate judge pursuant to 28 U.S.C. § 636(c). (ECF 7).

hearing on the motion is not necessary. L.R. 105.6. For the reasons explained below, Defendants'

motion for summary judgment is GRANTED IN PART AND DENIED IN PART.[2]

## I.    **Factual Background**

This case stems from an incident that occurred on May 24, 2021, while Plaintiff was a

pre-trial detainee at MCCF. (Compl. ¶ 1). MCCF is owned and operated by the government of

Montgomery County, Maryland, and Pate and Butterworth were employed as correctional

officers at MCCF. (Compl. ¶¶ 2, 3, 4). Plaintiff entered custody at MCCF on December 23,

2020, after being arrested and charged for armed robbery and first-degree assault.[3] (Key Dep.

16:1–14).

During the relevant period, Plaintiff was assigned to cell no. 2 in a unit or pod called

West 21, was near the cell of an inmate named Nate Beckwith. (Key Dep. 42:21–44:16, 98:10–

16). On May 24, 2021, Plaintiff was outside his cell for his scheduled recreation time. (ECF 32-3

at 1). Beckwith was preparing to move to another cell unit, and Plaintiff asked him for a candy

while standing near the door to Beckwith's cell. (Key Dep. 42:25–43:12). Lieutenant Hood, a

correctional officer, was standing behind the correctional officers' desk on the unit along with

Officer Daramy, waiting for Beckwith to be escorted. Hood instructed Plaintiff to move away

from the door to Beckwith's cell. (Key Dep. 42:13–16; ECF 32-3 at 1). According to report

authored by Daramy, Plaintiff disregarded multiple orders to step away from Beckwith's cell and

became belligerent and argumentative. (ECF 32-3 at 1). Hood then placed a call for assistance or

---

[2] Plaintiff has also filed an unopposed motion for leave to file physical exhibits, which will be granted for
reasons explained in footnote 10 *infra*.

[3] Plaintiff subsequently pleaded guilty to assault in the first degree and received a sentence of twenty-five
years in prison, all but five years suspended. (Key Dep. 16:15–25).

"code"[4] for an inmate refusing to lock in,[5] and Daramy ordered all inmates who were out of their cells for recreation to lock in. (*Id.*)

Plaintiff testified in his deposition that when Hood ordered him to move away from Beckwith's door, he began stepping backwards from the door but continued to speak with Beckwith. (Key Dep. 44:19–23). At the time Hood ordered the lock-in, Plaintiff had about 25 minutes of recreation time remaining. According to Plaintiff, he and Hood had a brief exchange of words: Plaintiff asked why he was being ordered to lock in and stated he had done nothing wrong; Hood instructed Plaintiff again to lock in and said he was disobeying an order; Plaintiff denied he was disobeying an order but was only asking a question; Hood accused Plaintiff of refusing to lock in and "call[ed] in the code"; Plaintiff continued to deny he was refusing the order and, by now, was at the door to his cell with his hand on the handle; Plaintiff asked for his cell door to be opened, attempting to lock in, but Hood refused to open the door. (Key Dep. 49:19–50:9).

Butterworth was a member of the Emergency Response Team ("ERT") at the time of the incident and responded to the call for assistance. (Butterworth Dep. 9:4–19). When asked why, at this point, Plaintiff's cell door was not opened so that he could placed into his cell, Butterworth testified in his deposition that, "once a code is called, the inmate is not going to stay on the unit[] [but] is going to be handcuffed[] and . . . taken to inmate processing to be strip searched and to segregation for housing pending an adjustment hearing." (Butterworth Dep. 21:8–19).

---

[4] A call for assistance or "code" is a situation where a radio call is made when an officer needs assistance and requests additional officers to respond to an incident. (Defs.' Mem. Supp. Summ. J. at 3 (citing Butterworth Dep. 16:11–17:8)).

[5] "Lock in" is an instruction for inmates to "go into their cell with the door closed." (Defs.' Mem. Supp. Summ. J. at 3; Key Dep. 30:2–4).

Butterworth also testified that the code called for Plaintiff "was for an inmate refusing to lock in." (Butterworth Dep. 20:21–21:4).

Pate testified in his deposition that when he first arrived on the scene of the incident, he "observed a few officers ahead of [him]" and "heard [the officers] telling [Plaintiff] to turn around and be cuffed up, to lock in." (Pate Dep. 9:7–14, 10:4–19). Pate also observed that Plaintiff "was standing by the cells" and "refusing to lock in[,] . . . refusing to turn around and be cuffed." (*Id.*) Other officers, including Butterworth, arrived on the scene after Pate. (Defs.' Mem. Supp. Summ. J. at 5 (citing ECF 32-5 at 0:02:32)).

When Butterworth arrived at the unit, Plaintiff was "standing with his back to the wall and facing the officers" who were standing about an arm's length from Plaintiff and surrounded him "like a half circle." (*Id.*; Butterworth Dep. 19:6–19). Butterworth testified that, as he approached, he heard orders being given for Plaintiff to turn around to be handcuffed.[6] (Butterworth Dep. 19:20–20:20). As he approached Plaintiff, Butterworth also gave Plaintiff an order to turn around and face the wall, but Plaintiff did not comply. (Butterworth Dep. 21:20–22:11). According to Butterworth, at this point, Plaintiff's fists were clenched and Plaintiff was "moving back and forth" at an increasing pace: "From the time I walked in and first saw him to the point when I gave my order, he was becoming visually more upset." (Butterworth Dep. 23:5–19). Butterworth testified that Plaintiff stated, "If you touch me, I am going to fuck you up." (Butterworth Dep. 23:5–15). Butterworth perceived that Plaintiff "was becoming a lot more aggressive in the few seconds that it took [Butterworth] to get over there." (*Id.*) He could not recall if Plaintiff ever moved his fists from next to his body or lifted his fists up at any point. (Butterworth Dep. 23:20–24:4). Butterworth testified that, although Plaintiff "was moving back

---

[6] Butterworth was "not sure who exactly was giving the orders, but there were multiple officers there attempting to get [Plaintiff] to turn around." (Butterworth Dep. 19:30–20:9).

and forth," he did not lunge at anyone or push anyone. (Butterworth Dep. 19:2–5, 24:5–6). Butterworth further testified that Plaintiff's behavior and actions put him in fear of safety and himself and others, explaining, "I didn't know if he was going to assault someone, . . . due to his behavior." (Butterworth Dep. 24:7–17).

In an effort to gain Plaintiff's compliance, Butterworth testified that he "grabbed [Plaintiff's] jumpsuit with [his] right hand more towards the middle of [Plaintiff's] chest and [put his] left hand on [Plaintiff's] right shoulder[,] . . . attempt[ing] to turn him [counterclockwise] to the wall." (Butterworth Dep. 27:2–5). According to Butterworth and Pate, Plaintiff resisted and pulled his body away from Butterworth. (Butterworth Dep. 28:6–17; Pate Dep. 18:6–19). After pulling Plaintiff "the opposite direction of the way he was trying to go," Butterworth "pivoted [his] hips and place[d] [Plaintiff] on the ground." (Butterworth Dep. 28:6–21, 30:1–17). Plaintiff was first standing and then squatting or crouching at the time Butterworth began to take him to the ground. (Butterworth Dep. 26:21–27:1, 30:18–21). During that time, Butterworth did not consider turning [Plaintiff] around or "pushing him down so his buttocks were on the ground." (Butterworth Dep. 66:10–67:7). Butterworth testified that he would not do anything different based on his training. (Butterworth Dep. 67:8–19). The distance between where Plaintiff was crouching or squatting and where he was ultimately placed on the ground was seven to eight feet. (Butterworth Dep. 67:21–69:1). He testified that no one punched Plaintiff at any point during the incident, and he did not hear Plaintiff state that he was injured. (Butterworth Dep. 73:18–74:12). Butterworth denied that he held Plaintiff's hands behind his back so Pate could punch him. (Butterworth Dep. 73:6–17). Pate testified that he did not touch Plaintiff at all before Butterworth grabbed Plaintiff by the jumpsuit, but he assisted in handcuffing Plaintiff after Plaintiff was on the ground. (Pate Dep. 18:6–9, 62:4–7).

Plaintiff's account of the incident varies from that of Butterworth and Pate. According to Plaintiff, none of the responding ERT personnel instructed him to turn around to be handcuffed. (Key Dep. 74:23–75:15). Plaintiff testified that he tried to explain why Hood called the code and, if one of the responding officers instructed him to "turn around and cuff in," he "[p]robably would have complied" because he "would have had no other choice." (Key Dep. 75:25–77:13). Plaintiff denied that he clenched his fists when the officers were talking to him or that he made any threatening gesture toward the officers. (Key Dep. 75:22–24, 77:14–19). He testified that he told the officers, "I am not going to swing." (Key Dep. 75:19–21).

During his deposition, Plaintiff initially testified that, while he was standing with his back to the wall, Butterworth grabbed both his hands and pulled Plaintiff towards him, leaving Plaintiff's left rib cage exposed, and that Pate then hit Plaintiff twice in the rib cage and once on the left side of his face.[7] (Key Dep. 73:15–25; 79:22–82:1). Then, Butterworth flipped Plaintiff and slammed him on the ground and while Plaintiff was face down on the ground, other officers jumped on top of him. (*Id*.) Plaintiff did not recall that anyone struck him when he was on the ground. (Key Dep. 82:6–19).

Plaintiff was shown a surveillance video recording of the incident during his deposition. (Key Dep. 95:4–10). After viewing the video, Plaintiff testified that he was punched by Pate on

---

[7] Plaintiff's declaration dated October 26, 2021, provides a similar but unidentical description of the incident:

> While Defendant Correctional Officer Butterworth intentionally held my arms behind my back, Defendant Correctional Officer Pate repeatedly and intentionally punched me in my face and left rib cage, intending to cause me pain and injury. Defendant Correctional Officer Butterworth intentionally held my arms behind my back for the purpose of allowing Defendant Correctional Officer Pate to be able to punch me without me being able to defend myself. I sustained significant injuries, including broken ribs.

(Key Decl. ¶ 6).

his right side: "I remember being hit on my left side. Maybe it's because that's where the pain

was. But when I seen [*sic*] the video, I was hit on my right."[8] (Key Dep. 143:24–144:2).

    As to the way in which Butterworth took Plaintiff to the ground, Plaintiff testified that he

thought Butterworth "slammed [him] too hard against the ground" because Plaintiff "was not

being aggressive at all to where [Butterworth] had to take that type of force." (Key Dep. 86:12–

88:1).

    When asked whether Plaintiff was punched after reviewing the video, Plaintiff's liability

expert, Harry Carl McCann, Jr., testified in his deposition that the video depicts "Butterworth

with his fist clenched near [Plaintiff's] facial area." (McCann Dep. 65:2–8). McCann testified

that he was "not sure if [Plaintiff] was punched or not, but . . . it's a probability." (*Id.*) McCann

testified that he would categorize Plaintiff as a "passive resistor," even if Plaintiff was clenching

his fist, refusing to lock in, disobeying orders, and making threats.[9] (McCann Dep. 56:12–17).

According to McCann, "the part [of the officers' use of force] that was excessive was the idea of

having control of [Plaintiff] with the four correctional officers around him and then throwing him

to the floor approximately the four to five feet. . . ." (McCann Dep. 63:1–10). McCann opined

that "Butterworth's actions, in particular, were inappropriate for . . . this kind of event."

(McCann Dep. 77:14–22).

---

[8] In his opposition, Plaintiff asserts that "the video footage reveals a punch by . . . Butterworth" and that Plaintiff "reacted to [the] punch by doubling over" and "then moved backwards" causing him to squat. (Pl.'s Opp'n at 5, 6, 9). Plaintiff characterizes the video as depicting Butterworth lifting Plaintiff and then dragging Plaintiff seven to eight feet from where Plaintiff had been crouching or squatting before throwing Plaintiff to the ground with the Plaintiff landing on his stomach. (Pl.'s Opp'n at 10).

[9] McCann testified that, in his review of the video, he could not clearly see that Plaintiff's fists were clenched. (McCann Dep. 114:13–16).

The parties have provided a copy of the surveillance video recording for the Court's review. Defs.' Exh. 3; Pl.'s Exhs. 2 and 3.[10] The video recording does not include sound. In the video, Plaintiff can be seen standing outside cell nos. 2 and 3. At least four correctional officers (including Pate) come to surround Plaintiff, and Plaintiff stands between the officers and the door to cell no. 2. In less than one minute, Butterworth approaches Plaintiff, and a physical altercation begins between the two. Within seconds, Butterworth appears to grab Plaintiff, Plaintiff appears to crouch, and Butterworth then turns Plaintiff in the opposite direction and finally places him on the floor. All persons depicted in the video are wearing dark clothing, making it difficult for the Court to determine with any certainty whether Butterworth punched Plaintiff at any point. Plaintiff's Exhibit 2 isolates a portion of the video that he contends depicts Butterworth's hand striking Plaintiff before Butterworth places Plaintiff on the floor.

Shelford Gilliam, Deputy Warden of Custody and Security for Montgomery County Department of Correction and Rehabilitation, executed a declaration on behalf of Montgomery County. Referring to the portion of the surveillance video isolated in Plaintiff's Exhibit 2, Gilliam states, "I am unable to make any definitive statement as to who's [sic] hand is shown in the [video] due to the grainy quality of the screenshot and because there are multiple individuals shown in the screenshot who are all wearing dark clothing." (Gilliam Decl. ¶¶ 3, 10). Gilliam further attests, "The County investigated the [i]ncident and [Plaintiff's] allegations that he was punched by Officer Pate and found that neither Officer Pate nor any other [officer] punched [Plaintiff] during the [i]ncident." (Gilliam Decl. ¶ 12).

---

[10] Defendants have attached a copy of the surveillance video recording to their motion as Defendants' Exhibit 3. Plaintiff has provided as Plaintiff's Exhibits 2 and 3 two videos extracted from Defendants' Exhibit 3, with an accompanying motion for leave to file physical exhibits. ECF 40. The Court has reviewed each of the parties' video exhibits. Plaintiff's motion is not opposed and will be granted.

After Plaintiff was handcuffed, he was taken to a medical unit[11] where he told the nurse that "the left side of [his] body hurt," his "rib cage hurt," and he was "in pain." (Key Dep. 118:15–25). Plaintiff received ibuprofen for his pain and learned that he had broken ribs a few days later. (Key Decl. ¶ 6; Key Dep. 118:20–119:15). Plaintiff did not have broken ribs prior to the incident and believes that his ribs were broken as a result of the incident. (Key Dep. 83:10–20, 85:7–11).

## II.    <u>Legal Standard</u>

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall grant a party's summary judgment motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). To avoid summary judgment, the non-moving party must demonstrate that there is a genuine dispute of material fact. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue as to material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Sharif v. United Airlines*,

---

[11] According to Butterworth, it is a standard operating procedure that, after every use of force, the inmate is seen by medical staff. (Butterworth Dep. 73:13–17).

*Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016);

*Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). To defeat the motion for summary judgment, "the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson*, 477 U.S. at 248). "Unsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is likewise insufficient to overcome a defendant's motion for summary judgment. *Anderson*, 477 U.S. at 252. A plaintiff opposing summary judgment must present "evidence on which the jury could reasonably find for the plaintiff." *Id.*

Summary judgment is proper if "a party fails to establish the existence of an element essential to that party's case" or "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Perkins*, 936 F.3d at 205 (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)). The court must view all the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587, but the court is not to weigh the evidence, make credibility determinations, or decide the truth of disputed facts, *Anderson*, 477 U.S. at 249; *see also Wilson v. Prince George's Cty.*, 893 F.3d 213, 218–19 (4th Cir. 2018); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016); *Jacobs v.*

*N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). In the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644–45 (4th Cir. 2002).

## III.    Analysis

### A.  Claims Against Pate

Defendants argue that "the surveillance video conclusively shows that there is no genuine fact in evidence to support that Officer Pate punched, hit or otherwise injured Plaintiff at all during the interaction at issue." (Defs.' Mem. Supp. Summ. J. at 14). Plaintiff acknowledges that "Pate does not clearly appear to have physically touched or punched the Plaintiff during the May 24, 2021 incident." (Pl.'s Opp'n at 1). "As a result, the Plaintiff does not intend to move forward with claims against Officer Pate." (*Id*. at 2). Therefore, Pate is entitled to summary judgment on Counts I and III.

### B.  Count II - 42 U.S.C. § 1983 Excessive Force Claim Against Butterworth[12]

Defendants argue that Butterworth did not use excessive force or otherwise violate Plaintiff's Fourteenth Amendment rights. Specifically, Defendants argue that Butterworth did not punch Plaintiff and that his actions are in line with MCCF policies governing safety and order, and responsive to his the on-the-ground, in-the-moment knowledge and perception at the time of the incident. As such, Defendants argue, Butterworth's response to Plaintiff's resistance was objectively reasonable based upon a totality of the circumstances. Defendants aver that, even if

---

[12] Defendants describe this count as "Count II - Violations of the Due Process Clause of the Fourteenth Amendment under 42 U.S.C § 1983 against Officer Butterworth (inflicted punishment on Plaintiff through the use of excessive force)." (Defs.' Mem. Supp. Summ. J. at 1–2).

this Court finds that Butterworth used excessive force, he is entitled to qualified immunity because it was not clearly established that the force used by Butterworth in taking Plaintiff to the ground to be handcuffed in any way violated Plaintiff's constitutional rights. The Court will address the two issues in turn.

        1.  <u>Excessive Force</u>

Under 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, subjects the plaintiff "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g., Filarsky v. Delia*, 566 U.S. 377, 383 (2012). Section 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see also Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

"To prevail under 42 U.S.C. § 1983, a plaintiff must show, first, that he was deprived of a right secured by the constitution or laws of the United States, and second, that the defendant acted under color of state law." *Conner v. Donnelly*, 42 F.3d 220, 223 (4th Cir. 1994) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)). Section 1983 also requires a showing of personal fault based upon a defendant's own conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). Thus, there is no *respondeat superior* liability under § 1983. *See Ashcroft*

*v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

The Due Process Clause of the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). The standard is objective, and courts are to ask whether an officer's actions are objectively reasonable in light of the facts and circumstances confronting them. *Lombardo v. City of St. Louis*, 594 U.S. ----, 141 S. Ct. 2239, 2241 (2021) (quoting *Graham*, 490 U.S. at 397).

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397. This list is not exclusive, however, and the standard cannot be applied mechanically. *Id*. Rather, objective reasonableness turns on the "facts and circumstances of each particular case." *Id*. (citing *Graham*, 490 U.S. 396). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id*. "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id*. (citing *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)).

In this case, there are genuine factual disputes related to several *Kingsley* factors. For instance, the parties dispute whether Plaintiff was instructed to turn around to be handcuffed when the ERT officers arrived on the scene; whether Plaintiff clenched his fists and made any threatening statements or gestures toward the officers; whether Plaintiff actively resisted Butterworth when he grabbed Plaintiff in an effort to arrest him; and whether Butterworth punched Plaintiff before taking him to the ground. Each party has offered testimony to support their version of events, and the surveillance video recording does not conclusively resolve the foregoing disputes. For example, there is no sound in the recording to confirm whether the ERT officers instructed Plaintiff to turn around to be handcuffed or whether Plaintiff made any threatening statements. And the video images are not clear enough for the Court to conclude that no reasonable juror would accept either party's position on whether Plaintiff made threatening gestures to the ERT officers or actively resisted Butterworth, or whether Butterworth punched Plaintiff at any point. On this record, it would be inappropriate for the Court to weigh the credibility of the testimony presented. The Court notes, finally, that evidence has been presented that Butterworth's actions caused Plaintiff a substantial injury.

In sum, the evidentiary record reflects genuine disputes of fact bearing on whether Butterworth's actions were "objectively reasonable in light of the facts and circumstances confronting [him]." *Lombardo*, 141 S. Ct. at 2241; *see also Duff*, 665 F. App'x at 244 ("factual disputes must be resolved to assess the *Kingsley* factors").

2.  Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223,

14

231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (quotations omitted). The doctrine is intended to give "government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); *see also Hunter v. Bryant*, 502 U.S. 224, 229 (1991) ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'") (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Qualified immunity is a defense from suit, not simply liability; the defense is effectively lost if a matter is improperly permitted to go to trial. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Therefore, resolution of whether an official is entitled to qualified immunity must be determined "at the earliest possible stage in litigation." *Hunter*, 502 U.S. at 227 (1991).

To determine whether defendant officials are entitled to qualified immunity, the court must determine "whether the facts viewed in [the plaintiff's] favor make out a violation of his . . . constitutional rights," and "whether that violated right was clearly established at the time." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022) (citing *Pearson*, 555 U.S. at 231). "The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." *Id.* But courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

A right is "clearly established" if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The "question of whether a right is clearly established is a question of law for the court to decide." *Ray v. Roane*, 948 F.3d 222, 228 (4th Cir. 2020) (citing *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992)). "The question of whether a reasonable officer would have known that the conduct at issue violated that right, however, cannot be decided prior to trial if disputes of the facts exist." *Id*. (citing *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). Thus, "while the purely legal question of whether the constitutional right at issue was clearly established is always capable of decision at the summary judgment stage . . . , a genuine question of material fact regarding [w]hether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial." *Id*. at 228–29 (quoting *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005)).

To determine the state of existing precedent in deciding whether a right was clearly established, courts in this circuit "first look to cases from the Supreme Court, [the Fourth Circuit], or the highest court of the state in which the action arose." *Id*. at 229 (citing *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004)). In the absence of "directly on-point, binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017); *see also Owens*, 372 F.3d at 279 ("[T]he absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). The right at issue must not be defined "at too high a level of generality" lest

government officials be deprived of "fair warning . . . that their conduct is unlawful outside an obvious case." *Ray*, 948 F.3d at 228 (citing *White v. Pauly*, 580 U.S. 73, 79–80 (2017)).

Here, the Court cannot find that Butterworth is entitled to qualified immunity because, as discussed in Part III.B.1 *supra*, there are several genuine disputes of material fact that preclude finding as a matter of law that Butterworth did not violate Plaintiff's clearly established constitutional rights. *See*, *e.g.*, *Davis v. Baltimore Cnty. Dep't of Corr.*, Civ. No. ELH-21-2268, 2022 WL 3975160, at *13 (D. Md. Aug. 31, 2022) ("Defendants' qualified immunity defense is unavailing because there exists a material dispute of fact regarding whether the conduct allegedly violative of [plaintiff's] constitutional rights actually occurred."). Therefore, Defendants' motion for summary judgment with respect to Count II will be denied.[13]

C. Count III - Maryland Declaration of Rights Excessive Force Claim Against Butterworth and Montgomery County[14]

Article 24 of the Maryland Declaration of Rights provides "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." MD. CONST. DECL. OF RTS. ART. 24. Article 24 is Maryland's constitutional guarantee of due process and equal protection of the law. *Town of Easton v. Pub. Serv. Comm'n*, 838 A.2d 1225, 1237 n.11 (Md. 2003). It "is the state law equivalent of the Fourteenth Amendment of the United States [Constitution]," *Hawkins v. Leggett*, 955 F. Supp.

---

[13] "Although it is true that qualified immunity is ordinarily determined at the summary judgment stage of litigation, . . . the defense of '[q]ualified immunity does not, however, override the ordinary rules applicable to summary judgment proceedings.'" *Davis*, 2022 WL 3975160, at *13 (quoting *Willingham*, 412 F.3d at 559); *see also Pritchett v*, 973 F.2d at 313.

[14] Defendants describe this count as "Count III - Violations of Article 24 of Maryland Declaration of Rights against the Officers and the County, (Officer Pate and Officer Butterworth allegedly inflicted punishment on Plaintiff through the use of excessive force with a claim of vicarious liability against the County)." (Defs.' Mem. Supp. Summ. J. at 2).

2d 474 (D. Md. 2013), and is ordinarily interpreted in *pari materia* with its federal counterpart. *See*, *e.g.*, *Littleton v. Swonger*, 502 F. App'x. 271, 274 (4th Cir. 2012); *Dent v. Montgomery Cty. Police Dept.*, 745 F. Supp. 2d 648, 661 (D. Md. 2010); *Tyler v. City of College Park*, 3 A.3d 421, 435 (Md. 2010). In other words, "[c]laims under Article 24 of the Maryland Declaration of Rights are assessed under the same standard as a [Fourteenth Amendment] due process claim pursuant to 42 U.S.C. § 1983." *Burkley v. Correct Care Sols.*, 2020 U.S. Dist. WL 2198123, at *5 (D. Md. May 6, 2020) (citation omitted). Although Article 24 mirrors in large part provisions of the Fourteenth Amendment that may be enforced through an action brought under § 1983, "different rules apply with respect to the remedies available" for Article 24 violations. *DiPino v. Davis*, 729 A.2d 354, 371 (Md. 1999). Importantly, "local governmental entities do, indeed, have *respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment." *Id.* at 51–52.

Accordingly, Plaintiff may prevail against Butterworth and Montgomery County on his Article 24 claim by demonstrating that the alleged constitutional violation, excessive force, was undertaken by Butterworth within the scope of his employment with Montgomery County. As discussed above, there are genuine disputes bearing on whether Butterworth violated Plaintiff's constitutional rights on May 24, 2021, which preclude summary judgment. Therefore, Defendants' motion for summary judgment will be denied with respect to Count III against Butterworth and Montgomery County.

## IV.     <u>Conclusion</u>

For the reasons stated above, Defendants' motion for summary judgment (ECF 32) will be GRANTED IN PART AND DENIED IN PART. Specifically, Defendants' motion will be

granted as to Plaintiff's claims against Pate and will be denied in all other respects. Plaintiff's

motion for leave to file physical exhibits (ECF 40) will be GRANTED.

A separate Order follows.

September 28, 2022 _____                  _____/S/_____
Date                                             Matthew J. Maddox
                                                 United States Magistrate Judge